FILED

2014 Aug-07  PM 03:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **TINA DOXIE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **3:12-cv-3702-AKK** |
| **VOLUNTEERS OF AMERICA,** | ) | |
| **SOUTHEAST, INC., et al.,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Tina Doxie, an African-American, claims that her former employers, Volunteers of America, North Alabama, Inc. ("Volunteers North Alabama"), and Volunteers of America, Southeast, Inc. ("Volunteers Southeast") (collective, "Defendants"), discriminated against her based on her race, retaliated against her based on her complaints of racial discrimination, and subjected her to a racially hostile environment, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Before the court is Defendants' motion for summary judgment, which is fully briefed. Docs. 71, 72, 91, & 92. For the reasons stated below, the motion is **GRANTED** as to Doxie's racial harassment claim under Title VII and retaliation claim, and **DENIED** in all other respects.

Accordingly, this matter is set for a **pretrial conference at 8 a.m. on September 22, 2014, by telephone, and for trial at 9:00 a.m. on October 27, 2014, at the U.S. Courthouse in Decatur, Alabama.** The attention of counsel is directed to the attached PRE-TRIAL CONFERENCE instructions, which require that counsel submit a proposed Pre-trial Order at least four business days in advance of their conference. The parties are **DIRECTED** to initiate the call with each other, then conference in the court by dialing (205) 278-1854.

## I. SUMMARY JUDGMENT STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted).

A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Id*. However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (*per curiam*) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560,1563 (11th Cir. 1989)).

## II.  <u>FACTUAL BACKGROUND</u>[1]

### A.    **Doxie's Employment**

Defendants are non-profit organizations contracted by the Department of Mental Health of Alabama to provide services to people with developmental and intellectual disabilities in Lauderdale County, Alabama. Doc. 76-14 at 28. Volunteers North Alabama hired Doxie as a House Manager on April 26, 2002, and assigned her initially to House 16. Docs. 73-1 at 69; 73-3 at 3. Thereafter,

---

[1]These are the "facts" for summary judgment purposes only and may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The court has gleaned these facts from the parties' individual submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. Finally, all reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).

beginning on October 8, 2002, and until the end of her employment, Doxie worked at Houses 26, 32, 33, 63, 69, 87, and 88. Docs. 73-1 at 49; 73-3 at 3.

Sometime in 2010 Volunteers Southeast reached an agreement to take over Volunteers North Alabama's operations. As a result, Doxie became a Volunteers Southeast employee on January 1, 2011. Docs. 73-1 at 11; 73-2. Prior to joining Volunteers Southeast, Doxie signed an employment agreement providing, in part, "I acknowledge and agree that [Volunteers] Southeast has *not* assumed *any obligation* [Volunteers North Alabama] may have owed to me before January 1, 2011." Doc. 73-2 at 2 (emphasis in original). At the time of the transition, Doxie worked at House 69 under the direct supervision of Pilar Smith. Doc. 73-1 at 25. However, the transition proved chaotic and created confusion over supervisory roles. *See* docs. 73-21 at 26; 73-17 at 17; & 90-1 at 65. The confusion escalated when Smith left Volunteers Southeast within one month of the switch, and Chris Noel became Doxie's immediate supervisor,[2] doc. 73-14 at 19.

**B.    Harassment**

The alleged harassment at issue spanned both employers. Allegedly, during Doxie's employment with Volunteers North Alabama, Teresa Stephenson, Sarah

---

[2]Doxie contends that Nicole Jones became her immediate supervisor, doc. 91 at 7, but the evidence she cites only states that Jones took over as Program Director, *see* doc. 73-1 at 25.

and Carrie Rickard, and Amy Johnson made disparaging remarks about African-Americans in Doxie's presence almost daily. *See* doc. 90-16 at 5. For example, while Doxie worked at House 16, Stephenson and Sarah Rickard "said that black men . . . leave black women [] because we was nasty, dumb, stupid, retarded and worthless," told another employee "that if she would ever get close to a n***** man, they don't know what they'll do to her," yelled racial epithets at an African-American male whenever he came by, and Stephenson told Doxie that she "don't like blacks." Docs. 73-1 at 44 & 47–48; 73-3 at 3. While Doxie worked at House 32, Carrie Rickard used the "N" word daily in Doxie's presence. Doc. 73-1 at 49. This sort of behavior continued until these individuals left Volunteers North Alabama: Johnson in July 2009; Carrie Rickard in August 2009; Sarah Rickard in November 2009; and Stephenson in March 2010. Doc. 90-16 at 7–8.

Although Doxie "did not hear the mean and hateful racial words and language on a daily basis" after Stephenson left in March 2010, Doxie claims that Nicole Jones, who took over Stephenson's job as Program Director, also harassed her. *See* docs. 90-16 at 8; 73-1 at 25. The alleged harassment consisted of the following: (1) Jones talked down to the African-American staff while conducting staff meetings at House 87, (2) the African-American staff feared Jones because Jones "did not like black people and let her dislike for black people known," and

(3) Jones told Doxie that she "didn't like black neighborhoods" while Doxie

worked at House 69. Doc. 73-1 at 53 & 83.

## C.    Doxie's Complaints

Doxie never filed a complaint about the alleged conduct while she worked

for Volunteers North Alabama.[3] However, in January 2011, after she transitioned

to Volunteers Southeast, Doxie gave her immediate supervisor, Pilar Smith, a

four-page, handwritten letter "complaining about racial discrimination, retaliation

and a hostile environment" at Volunteers Southeast and Volunteers North

Alabama.[4] Doc. 73-1 at 16. Doxie did not keep a copy of the letter, and the only

specifics she provided in her deposition is that she informed Smith that

Defendants would have discharged Doxie if she engaged in similar conduct as

Evelyn English:

> Q.    And what did you say to [Smith] when you gave [the letter] to
> her?
> A.    Telling her about how I was being treated [with] racial
> discrimination, that things that white people did that didn't get
> put on the administrative leave. That if I had done it, I would have

---

[3]Volunteers North Alabama's employee handbook provided that "[a]ny employee who believes that the actions or words of a supervisor or fellow employee constitute unwelcome harassment has a responsibility to report or complain as soon as possible to their supervisor and/or to the Human Resource Department or CEO." Doc. 73-10 at 38.

[4]Volunteers Southeast's policy required employees to "promptly report any incident of harassment or any other violation of [the] EEO/Harassment Policy directly to [their] Supervisor or [the] Human Resources Department . . . ." Doc. 73-11 at 10.

been put on administrative leave like I was and fired. And talking about Ms. Evelyn, how she came to work drunk every day, and I was reporting her and nothing ever was done. And her overdosing [a client] with medicine, and othing was ever done because she was white and I was black.

Q.    Anything else you told her?

A.    And how she would come to work late, and I would report everything that she was doing to her and nothing ever was done. But if I would have done it, I would have been done just like I am now. Put on administrative leave, fired, without insurance . . . .

Q.    Did you tell Ms. Smith anything else?

A.    No, no more than what I wrote on the paper and I talked to her about how I felt like I was being treated different from white people[].

*Id.* at 17 (alterations added). Doxie conveyed similar sentiments in early March 2011, when she told Valerie Acklin, a Licensed Practical Nurse, that English was "getting away with stuff because she's white," that an African-American in the same situation would have been discharged, and that Doxie was harassed by Stephenson. Doc. 73-1 at 41–42.

**D.    Doxie's Discharge**

In late March 2011, Volunteers Southeast received two anonymous complaints alleging that Doxie "berated and yelled at" her co-workers, "fussed" at English in a disparaging manner, threatened another co-worker, and yelled at Baron Kindle and a client at House 69. *See* doc. 73-5. These complaints prompted Kimberly O'Neal, an employee in the Human Resources Department, to launch an

investigation that included interviewing Doxie and the employees working at
House 69 (Dennis Doxie (Doxie's brother), Kindle, and Jim Norman) by telephone
on March 30, 2011.[5] Docs. 73-15 at 46–47; 73-14 at 50. Although "there was no
confirmed evidence during these calls," Norman, who initially denied the
allegations against Doxie, called O'Neal the next day, confirmed the allegations,
and faxed a written statement. *Id.* at 63–64 & 68. Apparently, Norman was too
nervous to disclose the bullying to O'Neal during the original phone call. *Id.* at 68.

On April 4, 2011, Cassandra Hall, Service Coordinator of Residential
Services, relayed to Doxie that Volunteers Southeast had decided to place Doxie
on administrative leave without pay. Docs. 73-1 at 9; 73-14 at 54. While on
administrative leave, Doxie sent O'Neal pictures from her phone of English
sleeping on the job. Doc. 73-1 at 35. After reviewing O'Neal's findings, DeAnna
Ferguson, Vice President of Services, decided to discharge Doxie for bullying and
harassing the staff at House 69. Doc. 73-14 at 54. Hall informed Doxie of the
decision on April 14, 2011, and Doxie received a letter informing her of her
discharge for a violation of employee conduct. Doc. 73-1 at 11 & 14.

---

[5]O'Neal could not interview English, doc. 73-15 at 47, because around the same time
Doxie complained to Acklin, someone reported English's mental health problems to DeAnna
Ferguson, Vice President of Services, who instructed English to visit a physician, docs. 73-14 at
58; 73-16 at 26. Thereafter, English took FMLA leave and never returned. Doc. 73-15 at 47.

# III. ANALYSIS

Initially, the court must address Doxie's assertion that Volunteers Southeast is the same legal entity as, or the legal successor to, Volunteers North Alabama because Doxie performed the same duties for Volunteers Southeast, Volunteers Southeast temporarily assumed Volunteers North Alabama's contracts, people commonly referred to the two companies by their common "Volunteers of America" name, O'Neal answered "correct" when Doxie's attorney asked if O'Neal first met Ferguson "[i]n regard to the merger," a Volunteers Southeast manager once referred to the switch as a "merger" on an employee's performance review,[6] and people confused the corporate names following the switch. Docs. 91 at 4 n.2; 73-1 at 23, 25–27, 30–31, 67, & 76; 73-14 at 22 & 74; 73-15 at 34 & 43; 73-16 at 35–36; & 73-19 at 9–10 & 25. Defendants contend that the corporations are separate entities that operated in different geographic areas until Volunteers Southeast took over Volunteers North Alabama's operations on January 1, 2011. *See* docs. 73-14 at 6–7; 73-3 at 3–4. Although the evidence supports Defendants' contention that the two companies are separate and distinct legal entities, the court cannot side with Defendants at this juncture because the parties failed to properly

---

[6]The employee immediately added, "Well, it wasn't actually a merger. He used that word as kind of a generic term, but that means the pulling together of North Alabama and Southeast." Doc. 73-19 at 25.

address the elements of successor liability.[7] Because "[a] corporation, which is found to be the successor of another corporation, can be held liable for the predecessor's unfair labor practices, but only if the successor knew of the labor law violations at the time of the transfer of the business," *Knox v. Brundidge Shirt Corp.*, 942 F. Supp. 522, 527 (M.D. Ala., 1996) (Title VII and § 1981 claims), the court will defer reaching a determination on this issue until later, if necessary. For purposes of this opinion, the court will assume that Volunteers Southeast is the legal successor to Volunteers North Alabama.

Turning to the substantive claims, Doxie maintains that she endured a racially hostile environment, and that discriminatory and retaliatory animus motivated her administrative leave and discharge. Because Title VII and § 1981 claims "have the same requirements of proof and use the same analytical framework, [the court] shall explicitly address [Doxie's] Title VII claim[s] with the understanding that the analysis applies to the § 1981 claim[s] as well." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). In that respect, the court will address the hostile environment claim first, and, in section

---

[7]Defendants simply state that "Volunteers Southeast is <u>not</u> the legal successor to Volunteers North Alabama," doc. 92 at 3 (emphasis in original), and Doxie cites to cases discussing successor liability without providing any substantive argument for why it applies in this case, *see* doc. 91 at 4–5 n.2.

B, the discrimination and retaliation claims.

## A.     Hostile environment

Defendants raise multiple arguments in favor of their motion on the race harassment claim: (1) that Doxie cannot establish a prima facie case; (2) that the claim is untimely; (3) that Doxie only raised discrimination and retaliation claims in her complaint and deposition testimony; (4) that Doxie waived her claims against Volunteers Southeast; and (5) Defendants are entitled to a *Faragher* defense.[8] *See* doc. 72 at 34–44. The court addresses these contentions below.

### 1.     Doxie can establish a prima facie case.

To establish a hostile environment claim, Doxie must show that:

> (1) [s]he belongs to a protected group; (2) [s]he was subjected to unwelcome harassment; (3) the harassment was based on [her] membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability.

*Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (quotation marks omitted). Defendants contend that Doxie cannot establish that the

---

[8]Because the court determines that only Doxie's Title VII hostile environment claim is time barred, it need not address Defendants' arguments that Doxie has no damages (which is premised on Chandler's claims being time barred) or their other Title VII specific arguments (i.e., that Doxie's allegations in this lawsuit exceed the scope of her EEOC charge).

harassment she endured was based on her race, or that it was sufficiently severe or pervasive. Doc. 72 at 37–41. For the reasons stated below, these two contentions are unavailing.

### i.   The harassment was based on Doxie's race.

Typically, "only conduct that is 'based on' a protected category, such as race, may be considered in a hostile environment analysis. 'Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or the offended party (the plaintiff), are not counted.'" *Jones*, 683 F.3d at 1297 (quoting *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000)) (internal citations omitted). Defendants argue that "[t]he racial slurs Doxie asserts . . . were not specifically directed at Doxie." Doc. 72 at 39. However, this is inconsequential because the alleged comments by Stephenson, Jones, and the Rickards unequivocally related to African-Americans. *See* doc. 73-1 at 44, 47, 49, 53, & 83. To the extent that Doxie can, in fact, prove that these individuals made the alleged derogatory comments in her presence, *see Adams v. Austal, U.S.A., L.L.C.*, --- F.3d ---, 2014 WL 2726171, *6 (11th Cir. 2014) ("a district court should not consider evidence of racial harassment of other employees—evidence that the plaintiff did not know about—in evaluating the objective component of a claim of a hostile work environment"), the fact that the alleged comments were not specifically

about Doxie is immaterial to the analysis of whether the alleged harassment Doxie endured was based on her race.

### ii. The harassment was sufficiently severe or pervasive.

Next, Doxie must show that the harassment was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment. This determination includes both a subjective and objective component. *Jones*, 683 F.3d at 1299. "The burden is on [Doxie] to demonstrate that [s]he perceived, and that a reasonable person would perceive, the working environment to be hostile or abusive." *Id.* At summary judgment, the court must accept that Doxie subjectively perceived that the harassment rose to this level. *Id.*

In determining whether a reasonable person would perceive the working environment as hostile or abusive, the court must look at the totality of circumstances and consider, *inter alia*: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Adams*, 2014 WL 2726171 at *7 (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999)) (quotation marks omitted). Conduct is objectively severe when the workplace is permeated with intimidation, ridicule, and insult. *Miller v. Kenworth*

*of Dothan, Inc.*, 277 F.3d 1269, 1276–77 (11th Cir. 2002).

Up until March 2010, Doxie allegedly endured racial slurs almost every day from Stephenson and the Rickards. Docs. 90-16 at 5 & 7–8; 73-1 at 44 & 47–49; & 73-3 at 3. First, this daily conduct for almost eight years was sufficiently frequent to create a hostile environment. *See Johnson v. Booker T. Washington Broad Serv., Inc.*, 234 F.3d 501, 508 (11th Cir. 2000) ("fifteen separate instances of harassment over the course of four months" was sufficiently frequent). Second, the perpetrators used the slurs in a disparaging, intimidating manner. *See* doc. 73-1 at 44 (Stephenson would tell another employee in Doxie's presence "that if she would ever get close to a n***** man, they don't know what they'll do to her."), & 48 ("when Amy's baby's daddy would come up to the Day Hab, [Stephenson and Sarah Rickard] would holler at him and call him n*****"); *see also Nichols v. Volunteers of America, North Alabama, Inc.*, 740 Fed. Appx. 757, 760–61 (11th Cir. April 18, 2012) (identical conduct found to be severe or pervasive). Third, many of the comments were humiliating. *See* doc. 73-1 at 44 (Stephenson and Sarah Rickard "said that black men . . . leave black women [] because we was nasty, dumb, stupid, retarded and worthless."). Finally, even though there is little evidence that these comments interfered with Doxie's job performance, "harassment need not be shown to be so extreme that it produces tangible effects

on job performance in order to be actionable." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1277 (11th Cir. 2002). In light of the frequency, severity, and humiliating nature of the conduct at issue, a jury could find that Doxie endured a racially hostile environment up until Stephenson's departure in March 2010.

The court makes a different determination regarding the time frame between March 2010, and Doxie's discharge in April 2011. Doxie makes vague allegations that Jones, Stephenson's replacement as Program Director, "did not like black people and let her dislike for black people be known," and that Jones talked down to African-Americans, but the only specific incident Doxie identifies is when Jones told Doxie that she disliked predominantly African-American neighborhoods. Doc. 73-1 at 53 & 83. Further, Doxie admits that she "did not hear the mean and hateful racial words and language on a daily basis" after March 2010. Doc. 90-16 at 8. As described to this court, Jones' conduct falls significantly short of the level necessary to sustain a racial harassment claim. Indeed, at worst, the alleged conduct by Jones amounts to the offhand comments and isolated incidents that courts have found do not establish a hostile environment. *See, e.g., Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22 (1993). Accordingly, the time frame for Doxie's hostile environment claim extends only until March 2010.

**2.     Doxie's Title VII claim is untimely.**

Defendants contend that Doxie's hostile environment claim is administratively barred on timeliness grounds under Title VII, and falls outside the statute of limitations for § 1981. Doc. 72 at 36; *see* 42 U.S.C. § 2000e-5(e)(1) (plaintiff has 180 days to file an EEOC charges); *Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1337 (11th Cir. 2008) (four year statute of limitations for § 1981 claims). Because the purported hostile environment lasted until March 2010, *see supra* Part III.A.1.ii, Doxie must have submitted an EEOC charge before October 2010 to maintain her Title VII claim, and she must have filed this action before April 2014 to maintain her § 1981 claim. Here, Doxie's Title VII hostile environment claim is untimely because she filed her EEOC charge in September 2011, well outside the 180 day period. However, Doxie can proceed with her § 1981 hostile environment claim because she filed her complaint within the four year statute of limitations.

**3.     Doxie's complaint and deposition testimony do not preclude her § 1981 hostile environment claim.**

Defendants next contend that Doxie cannot maintain a claim for hostile environment because she only included generalized allegations in her complaint, and she later abandoned her hostile environment claim during her deposition. Doc.

72 at 34–35. The court disagrees with both of these assertions. First, although

Doxie was not obligated to "allege 'specific facts' beyond those necessary to state

[her] claim and the grounds showing entitlement to relief," *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007), Doxie's complaint includes sufficient

allegations to correctly plead a hostile environment claim. Among other things,

Doxie alleges that "almost every day, Stephenson, S. Rickard, Carrie Rickard[],

Amy Johnson[], and Melissa Castle[], in Doxie's presence, talked about how they

disliked and hated black men and how black men went to white women because

all black women were nasty, dumb, stupid, retarded, and worthless, and that they

hated all relationships between black men and white women," that "all black

people are good for is to clean up poop," and that these employees also voiced

strong displeasure against interracial relationships. Doc. 26 at 7. These allegations

outlined the facts "necessary to state [a hostile environment] claim and the

grounds showing entitlement to relief." *Twombly*, 550 U.S. at 570.

Second, Doxie clarified several times in her testimony that she is alleging a

racially hostile environment claim. *See, e.g.,* doc. 73-1 at 74 (Doxie asserts that the

EEOC charge "should [allege that I was harassed and subjected to a racially

hostile environment], shouldn't it? Ain't that what I'm filing for? I mean, that's

my complaints."); *see also id.* at 80, 87, 88, & 90. Moreover, Defendants

mischaracterize Doxie's testimony. For example, even though Doxie only answered negatively when asked if there were any additional allegations regarding her *retaliation* claim, *see id.* at 71–72, Defendants assert now that Doxie was referring to her entire case, *see* doc. 72 at 34–35. The evidence simply does not support Defendants' contention that Doxie abandoned her hostile environment claim.

### 4.      Doxie did not waive her claims against Volunteers Southeast.

Defendants next contend that Doxie waived her hostile environment claim against Volunteers Southeast because she signed an employment agreement stating "that Volunteers Southeast 'has not assumed any obligation [Volunteers North Alabama] may have owed to [Doxie] before January 1, 2011.'" Doc. 72 at 37 (quoting doc. 73-2 at 2) (some alterations added). Doxie asserts that Defendants' contention "is ungrounded in law, against public policy, and wholly frivolous." Doc. 91 at 17–18 n.4. Indeed, Defendants cite no law in support of their waiver argument. As previously mentioned, the court will consider Volunteers Southeast the legal successor to Volunteers North Alabama for purposes of this opinion. As a result, the court must closely scrutinize the employment agreement to determine whether Doxie "knowingly and voluntarily" consented to the release of her § 1981 rights. *See Beadle v. City of Tampa*, 42 F.3d

633, 635 (11th Cir. 1995). However, neither party addresses the factors this court

must consider in making such a determination.[9] Accordingly, the court will defer

its determination of whether Doxie waived her claims against Volunteers

Southeast for actions occurring while Volunteers North Alabama employed her.

### 5.    Defendants are not entitled to a *Faragher* defense at summary judgment.

Finally, Defendants contend that they are entitled to a *Faragher* defense

because they can prove "(a) that [Volunteers Southeast and Volunteers North

Alabama] exercised reasonable care to prevent and correct promptly any [racially]

harassing behavior, and (b) that [Doxie] unreasonably failed to take advantage of

any preventive or corrective opportunities provided by [Volunteers Southeast and

Volunteers North Alabama] or to avoid harm otherwise." *Faragher v. City of Boca

Raton*, 524 U.S. 775, 778 (1998). Each Defendant has a policy requiring

employees to report or complain about harassment as soon as possible to their

supervisor or to the Human Resource Department. *See* docs. 73-10 at 38; 73-11 at

10. However, regarding Volunteers North Alabama, the Eleventh Circuit found in

---

[9]"In determining whether a release was knowingly and voluntarily entered, the factors that guide a court include: the plaintiff's education and business experience; the amount of time the plaintiff considered the agreement before signing it; the clarity of the agreement; the plaintiff's opportunity to consult with an attorney; the employer's encouragement or discouragement of consultation with an attorney; and the consideration given in exchange for the waiver when compared with the benefits to which the employee was already entitled." *Beadle*, 42 F.3d at 635.

a related case that "numerous . . . employees complained to . . . human resources about the discrimination and harassment multiple times, and at no point did [Volunteers North Alabama] conduct an investigation." *King v. Volunteers of America, North Alabama, Inc.*, 502 Fed. Appx. 823, 830 (11th Cir. Dec. 19, 2012). Similarly, in this case, April Chandler and Sonja King, two of Doxie's co-workers, purportedly complained about Stephenson's harassment when it originally occurred, but Volunteers North Alabama ignored their complaints. *See* docs. 90-8 at 4–6; 90-5 at 8–10. Accordingly, even absent a complaint by Doxie, "a reasonable jury could conclude that [Volunteers North Alabama] did not have an adequate system in place to prevent and correct hostile behavior." *King*, 502 Fed. Appx. at 830.

With respect to Volunteers Southeast, Doxie notified her immediate supervisor, Smith, about the purported harassment in January 2011. *See* doc. 73-1 at 16. However, when pressed about the content of her complaint, Doxie testified that she complained about a co-worker's (English) conduct and, more specifically, her belief that Volunteers Southeast would discipline Doxie if she engaged in similar conduct as English. *Id.* at 17. Critically, at no point did Doxie claim she told Smith about any specific conduct directed at Doxie that contributed to the alleged hostile environment, especially the alleged conduct by Nicole Jones. *Id.* at

16–17. Moreover, although Doxie notified Acklin in March 2011 about Stephenson's conduct, Acklin was not Doxie's supervisor,[10] *see* doc. 73-18 at 89, and, given that Stephenson left Volunteers North Alabama in March 2010, doc. 90-16 at 7–8, it is unclear what Doxie hoped Acklin or Volunteers Southeast would do about Stephenson. The rest of the complaint to Acklin centered also on the alleged preferential treatment of English and Doxie's belief that Volunteers Southeast would discharge Doxie if she engaged in similar conduct as English. Doc. 73-1 at 41–42. While Doxie is free to formulate this belief, facts, not speculation or conjecture, are necessary to establish a claim. *See Myers v. Bowman*, 713 F.3d 1319, 1327 (11th Cir. 2013). Where, as here, Doxie does not allege that she told Volunteers Southeast about any alleged racial harassment related to her—especially the alleged conduct by Nicole Jones which is the only alleged harassing conduct that occurred after the switch to Volunteers Southeast—a jury cannot conclude that Doxie reasonably took advantage of any preventive or corrective opportunities that Volunteers Southeast provided. Therefore, as it relates to conduct directly attributable to it, including any alleged conduct by Nicole Jones occurring after December 30, 2010, Volunteers Southeast

---

[10]Doxie contends that Acklin was a supervisor, doc. 91 at 35, but the evidence she cites—Chandler's deposition testimony—only states that Acklin attended supervisory meetings, but "[s]he didn't supervise anyone," doc. 73-18 at 89.

is entitled to the *Faragher* defense and summary judgment to these claims.

However, because, as previously noted, Volunteers Southeast *may* be liable for

Volunteers North Alabama's conduct, the court will not grant Volunteers

Southeast summary judgment on a *Faragher* defense at this juncture for conduct

occurring prior to December 30, 2010, because Volunteers Southeast's liability, if

any, would be based on successor liability for Volunteers North Alabama's

purported failure to effectively address the alleged conduct.

**B.     Discrimination and Retaliation**

Doxie contends also that Defendants discriminated against her based on her

race and retaliated against her by placing her on administrative leave and

subsequently discharging her. *See* doc. 91. Because Doxie is relying exclusively

on circumstantial evidence, the burden of proof is ordinarily governed by the

*McDonnell Douglas* framework, *see Standard*, 161 F.3d at 1331 (discrimination);

*Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)

(retaliation), which first "requires the plaintiff to create an inference of

discrimination [or retaliation] through her *prima facie* case," *Springer v.*

*Convergys Customer Management Group, Inc.*, 509 F.3d 1344, 1347 (11th Cir.

2007) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

Once a plaintiff establishes a prima facie case, the burden shifts to the employer to

articulate a legitimate, non-discriminatory or non-retaliatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If the employer meets this burden, the plaintiff must show that the proffered reasons were pretextual. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993).

## 1.     Discrimination Claim

"To establish a prima facie case for disparate treatment in a race discrimination case, the plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006). Defendants challenge only the third element, contending that "Defendants did not treat similarly situated employees outside Doxie's classification more favorably than Doxie." Doc. 72 at 33.

"To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that [s]he and the employees are similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted). If this is not the case, "the different application of

workplace rules does not constitute illegal discrimination." *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) (citing *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1186 (11th Cir. 1984)). In order to be considered "similarly situated," the compared employees must have been "involved in or accused of the same or similar conduct," yet "disciplined in different ways" for that conduct. *Holifield*, 115 F.3d at 1562 (citations omitted).

In this case, Doxie alleges that Defendants discriminated against her by placing her on administrative leave and discharging her. For her comparator, Doxie cites to Nicole Jones, whom Doxie alleges Defendants never disciplined even though Jones purportedly bullied Chandler by jerking papers out of Chandler's hands during a meeting, docs. 73-18 at 38 & 65, and demeaned and belittled African-American employees by talking "ugly and angry and just mean" to them, doc. 73-1 at 53. Although Doxie has presented no evidence that anyone accused Jones of bullying a client (which is one of the allegations against Doxie), the court need not focus on this difference between Doxie and Jones because Ferguson is clear that Doxie "was terminated for bullying and harassing *the staff* at [House 69]." Doc. 73-14 at 54 & 65(Doxie was discharged for "[t]alking derogatory to *the staff*. Telling them that they weren't doing their jobs. It was not her place. If she had problems with the staff and their performance, she should've

went to her supervisor and let the supervisor deal[] with it.") (emphasis added).

Accordingly, viewing the evidence in the light most favorable to Doxie, the court

finds that Doxie has identified an "appropriate comparator" to establish her prima

facie case.

In light of Doxie's prima facie case, the burden shifts to Defendants to

articulate a non-discriminatory reason. Defendants contend that Volunteers

Southeast placed Doxie on administrative leave and discharged her because "she

was bullying co-workers and a client."[11] Doc. 72 at 31. This reason initially

satisfies Defendants' burden under the *McDonnell Douglas* framework because

Defendants "need only produce evidence that could allow a rational fact finder to

conclude that [Doxie's] discharge was not made for a discriminatory reason."

*Standard*, 161 F.3d at 1331. "In light of this, [Doxie] must now create a genuine

issue of material fact as to whether the reasons advanced are pretextual. In other

words, [Doxie] must provide sufficient evidence to allow a reasonable fact finder

to conclude that the proffered reasons were not actually the motivation for h[er]

discharge." *Id.* at 1332; *see Combs v. Plantation Patterns*, 106 F.3d 1519, 1538

(11th Cir. 1997) (internal quotation marks and citations omitted) ("The district

---

[11]Again, the decision maker is clear that she discharged Doxie for misconduct directed at
the staff. Doc. 73-14 at 54 & 65.

court must evaluate whether [Doxie] has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendants'] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.").

Here, the circumstances surrounding Doxie's discharge are suspicious, at best. For example, the original complaints about Doxie's conduct were anonymous, and could have easily been fabricated. Indeed, O'Neal's initial investigation failed to substantiate the allegations. *See* doc. 73-15 at 63–64. It was only a day later that Norman changed his story and confirmed the allegations against Doxie. Moreover, Acklin, the nurse Doxie worked with on a daily basis, was surprised to learn that Volunteers Southeast discharged Doxie for bullying. Doc. 73-17 at 16. While Acklin may simply not have been privy to the bullying complaints, given that only Norman confirmed the allegations (albeit a day later), and there is no evidence that Doxie bullied co-workers prior to March 2011, *see* doc. 73-14 at 76, there is enough here for a jury—if it is so inclined—to find the articulated reason for Doxie's discharge pretextual, *see Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005). Accordingly, Defendants' motion on the discrimination claim is due to be denied.

### 2.     Retaliation Claim

Doxie alleges that Defendants retaliated against her by placing her on administrative leave and discharging her. To make a prima facie case of retaliation, Doxie "must present evidence that: (1) [s]he engaged in statutorily protected conduct; (2) [s]he was adversely affected by an employment decision; and (3) there was a causal connection between the statutorily protected conduct and the adverse employment decision." *Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006). Defendants challenge the protected activity and the causal connection prongs.

### i.     Doxie engaged in statutorily protected conduct.

To demonstrate that she engaged in a protected activity under the opposition clause,[12] Doxie "must show that she 'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1312 (11th Cir. 2002) (quoting *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). "It . . . is not enough for a plaintiff to allege that [her] belief in this regard was honest and bona fide; the

---

[12]"Title VII's retaliation provisions do protect certain kinds of activity. Under the opposition clause, an employer may not retaliate against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter.'" *E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (quoting 42 U.S.C. § 2000e–3 (a)).

allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." *Little*, 103 F.3d at 960. Here, when Doxie complained to Acklin in March 2011 about the harassment she endured from Stephenson, she had a reasonable basis to believe Stephenson subjected her to a hostile environment up until Stephenson left Volunteers North Alabama in March 2010. *See supra* Part III.A.1. Therefore, the court finds that Doxie engaged in statutorily protected conduct in March 2011.[13]

### ii.   There is no causal connection between Doxie's protected complaint and the adverse actions.

Generally, a plaintiff can establish the causation prong by "prov[ing] that the protected activity and the negative employment action are not completely unrelated." *Meeks v. Computer Assocs.*, 15 F.3d 1013, 1021 (11th Cir. 1994) (internal citation and quotation mark omitted). This is satisfied when the plaintiff "provides sufficient evidence that the decision-maker became aware of the

---

[13]The court will assume also that Doxie engaged in protected activity in January, even though Doxie's testimony belies this contention. Again, Doxie's January 2011 complaints to Smith only concerned English's poor performance, rather than any purported racial harassment directed at Doxie. *See* doc. 73-1 at 17. As the court noted previously, Doxie's belief that Volunteers Southeast would have discharged her if she had engaged in the same misconduct as English is "based on speculation and conjecture" and, thus, "is not reasonable." *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985). Moreover, although Doxie testified that she complained about a hostile environment to Smith, doc. 73-1 at 16, when pressed for details, Doxie only mentioned English's conduct, *id.* at 17. Further, even assuming Doxie believed that English's conduct created a hostile environment, the belief is unreasonable because English's conduct—arriving to work drunk and overdosing a client—was not based on Doxie's race. *See Jones*, 683 F.3d at 1297.

protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999). Unfortunately, Doxie has presented no evidence that Ferguson or O'Neal knew about Doxie's complaints to Acklin or Smith. *See, e.g.,* doc. 73-1 at 18 (Doxie never "call[ed] HR to inquire about whether or not they had received" her letter "because [Smith] said she was going to take care of it."), & 41–42 (not sure whether Acklin shared her complaints with O'Neal because Doxie "didn't check up on it."). Indeed, Ferguson stated that she "was never made aware of any complaints by Tina Doxie to . . . Pilar Smith[] or Valerie Acklin." Doc. 73-3 at 4. Instead, Doxie asks the court to deny summary judgment because a jury could find that "Ferguson and Volunteers [Southeast] learned about Doxie's complaints, investigated English as a result, and only now are feigning ignorance about the source of those complaints because of fear of consequences in this litigation." Doc. 91 at 22. However, while the court must view the facts in the light most favorable to Doxie, drawing the inference Doxie wants would require the court to speculate that whoever reported English's mental condition to Ferguson also reported Doxie's complaints about a hostile environment. Such a finding would be unreasonable. *See Blackston*, 764 F.2d at 1482. Further, the court cannot make such an inference based on Doxie's

complaints to Acklin because even Doxie admits that Ferguson knew about English's mental condition *prior* to Doxie's complaints. Doc. 91 at 9 (citing doc. 73-14 at 59) ("In February 2011, Ferguson knew that [] English was having confusion, had gotten confused while driving, and had gotten lost."). Accordingly, there is no causal connection between Doxie's protected activity and the adverse employment action, and Defendants' motion is due to be granted on Doxie's retaliation claim. *See Krutzig v. Pulte Home Corp.*, 602 F.3d 1231 (11th Cir. 2010) (no causal connection where "[t]here [] is no evidence in the record to support a finding that [the decision makers] knew of any [protected activity] at the time the decision was made to terminate [the plaintiff's] employment").

## IV.  CONCLUSION

For the aforementioned reasons, Defendants' motion for summary judgment is **GRANTED** as it relates to Doxie's retaliation claim and Title VII hostile environment claim. The motion is **DENIED** in all other respects.

**DONE** the 7th day of August, 2014.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

PRE-TRIAL DOCKET
HON. ABDUL K. KALLON, PRESIDING

**DECATUR, ALABAMA**

This case is  set for a pre-trial hearing pursuant to Rule 16 of the Federal Rules of Civil Procedure.  A conference-type hearing will be held by telephone at the time indicated.

The hearing will address all matters provided in Rule 16, including the limitation of issues requiring trial, rulings on pleading motions, and settlement possibilities.

Counsel attending the conference are expected to be well-informed about the factual and legal issues of the case, and to have authority to enter appropriate stipulations and participate in settlement discussions.  <u>Counsel appearing at the conference will be required to proceed at trial notwithstanding the naming of others as designated trial counsel.</u>

Promptly upon receipt of this notice, plaintiff's counsel is to initiate discussions with other counsel aimed at ascertaining which basic facts are not in dispute, at clarifying the parties' contentions (for example, just what is denied under a "general denial") and at negotiating  workable procedures and deadlines for remaining discovery matters.  <u>At least four (4) business days in advance of the conference, plaintiff's counsel is to submit to chambers (via email at **kallon_chambers@alnd.uscourts.gov**) a proposed Pre-trial Order in WordPerfect format</u>, furnishing other counsel with a copy.  It is anticipated that in most cases the proposed order, with only minor insertions and changes, could be adopted by the court and signed at the close of the hearing.

A sample of a proposed Pre-trial Order is available on the Chamber web site (www.alnd.uscourts.gov/Kallon/Kallonpage) to illustrate the format preferred by the court and also to provide additional guidance and instructions.  Each order must, of course, be tailored to fit the circumstances of the individual case.

Counsel drafting this proposed order should consider the utility this document will provide for the litigants, the jury, and the court alike.  The court anticipates using the pretrial order to (1) identify and narrow the legal and factual issues remaining for trial, and (2) provide jurors with the legal and factual context of the dispute.  This order should **not** revisit at length arguments made in previous filings with the court, nor should it serve as another venue for adversarial posturing.  Pretrial orders should be simple, short, and informative.

IN ANY CASE WHERE COUNSEL HAVE ANNOUNCED SETTLEMENT TO THE COURT, A CONSENT JUDGMENT IN SATISFACTORY FORM MUST BE PRESENTED TO THE COURT  PRIOR TO THE SCHEDULED TRIAL DATE; OTHERWISE, THE CASE WILL BE DISMISSED WITH PREJUDICE.